[Civ. No. 7811.   Third Dist.   Jan. 19, 1951.]

GEORGE MEILINK, Respondent, v. A. C. POLLARD et al., Appellants.

Dunnell, Herbert & Dunnell and Sheldon Rutherford for Appellants.

Francis H. Frisch for Respondent.

VAN DYKE, J.—Plaintiff and respondent, George Meilink, having supplied to appellants, Pollard and Goncalves, a farming copartnership, certain insecticides for crop dusting brought this action to recover the amount due therefor.   The insecticides were used in an attempt to control thrips and red spider infesting a crop of beans which appellants were growing by dry farming methods.   Appellants cross-complained, seeking damages, claiming the dust used had destroyed the crops.

They alleged that respondent, a distributor of insecticides manufactured for the market by others, had agreed to furnish a suitable insecticide and to properly apply it; that he did furnish two varieties of insecticides and applied the same, using an airplane for the purpose, but was negligent in that the materials were harmful to the crops, and were applied in excessive quantities and unskilfully; that as a result the crops were destroyed. These claims being controverted, the cause was tried; the court made findings generally favorable to respondent; gave judgment for respondent in the amount he sued for and adjudged appellants take nothing by their cross-complaint.

Appellants, in support of their appeal, contend generally that the evidence does not support the findings of the court upon which the judgment against them is based. ▉ This contention brings into operation the familiar rule that we must view the evidence and the permissible inferences that may be drawn therefrom in a light most favorable to respondent and must resolve all conflicts of evidence in support of the findings and judgment if reasonably possible. Responsive to that rule, we shall state the evidence which does in our opinion support these findings, but before doing so will say that from a careful reading of the voluminous record presented here it is apparent that a strong factual showing was made by appellants in support of their pleaded claims of liability. Yet we are bound by the rule above stated to affirm the judgment of the trial court if it is supported by substantial evidence in all essential matters. We think that it is.

▉ Respondent testified that he was engaged in the business of selling insecticides, handling the products of a number of companies manufacturing such materials; that about July 1, 1948, he talked with Pollard, one of the appellants, about dusting the bean crops and at his request quoted prices of insecticides, including the cost of applying the materials used to the crops; that he told Pollard he would use a suitable dusting material; that Pollard replied, "Go ahead, if you fellows can do the job"; that he then got in touch with a firm doing crop dusting work and engaged it; that he delivered two types of insecticides to the airport out of which the dusting firm operated its planes; that though Pollard asked for a certain brand of insecticide which he desired, Meilink told him that he was unable to obtain that particular brand, but could get a similar material and Pollard told him to go ahead and that that was the extent of the conversation; that on the

following day he examined the several fields in which the bean crops were growing, with a view to determining problems of applying the dust by plane; that he determined the dosage per acre by charts put out by the manufacturing company and from that source recommended to Pollard that 25 pounds per acre be used, which was done. The crop dusters testified generally that the plane dusted the various fields, using 25 pounds per acre of insecticide, applied uniformly. It appeared that a Mr. Storm, an entomologist, representing an insecticide manufacturer other than the one who put out the dust actually used, had, with an eye to business, been watching the progress of the bean crops and about one month before the dusting was done had discovered the beginning of infestation by thrips, followed shortly thereafter by the beginning of red spider attack. He informed the appellants of his findings and recommended dusting. He testified that about two weeks before the dusting was done he noticed the leaves of the plants were starting to discolor and warned Pollard that damage was starting to show and would spread, as the thrips multiplied very rapidly. Ten days before the dusting, Storm again visited the fields and found the thrips were hatching out in large numbers and estimated that damage to the plants had progressed to between 10 and 15 per cent by that day. He told Pollard of this and also that due to a strike in his employer's factory he could not supply their spray material and recommended that material be obtained from respondent. He visited the fields again a few days before the crops were dusted and found the number of thrips had increased and that damage to the leaves had become progressively worse and the leaves were browning, bleaching, curling and getting dry.

After the dusting had been completed and within a short time, appellants, noting deterioration in the bean plants, took some specimen plants to Dr. Stanley F. Bailey, concededly an expert on insect pests and their control, employed by the University of California at Davis, for examination. He found evidence of injury by thrips on the lower side of the leaves and confined to approximately the lower third of the plants examined. He designated it as flower thrips and testified it was still possibly susceptible to control. He said the plants showed evidence of damage which he could not attribute to thrips and which had the appearance of being scalds or burns arising from a cause he could not ascertain except to say that his microscopic examination and dissection convinced him

that this particular damage was not insect damage. He said the pests were capable of killing a whole field if allowed to go unchecked and, further, that since the crops in question were being raised without irrigation that factor would add to the damaging effect of activities by thrips as compared to damage from such cause in the case of irrigated crops. He explained that the thrips scar the underside of leaves and feed upon the exuded juices, thus drying up the plants and interfering with the normal work of the leaves in plant life. He stated the sort of infestation he found would cause leaves to dry and drop off, depriving the growing pods of beneficial shade from direct sunlight and that when the infestation was aggravated enough the insects would feed upon the pods themselves. He said the damage that had been done by thrips to the plants exhibited to him was enough to reduce the crop, but he could not say how much. He stated that one of the insecticides used was accepted and used quite widely in the control of thrips on bean crops and that the dosage used was within the recognized permissible limits; he said he had never seen injury sufficient to destroy a crop from application of 20 to 25 pounds per acre of that insecticide. As to the other insecticide used he stated he did not know very much about it. The question of the amount of moisture available for the crops was the subject of conflict, but Dr. Bailey stated that insufficient moisture would stunt the plants, causing the leaves to turn yellow and the plants to have a tendency to mature prematurely and make a poor crop; further that if, in addition to lack of moisture, a crop was subject to red spider or thrips attack often no crop would be made. There was testimony on the subject of moisture, all the way from a witness who declared he found within root depth sufficient moisture for the plants to make a crop to a witness who testified that the supply of moisture was quite inadequate.

The suitability of the soil for the growing of beans was also the subject of conflict, although it appears that had other conditions been favorable a considerable crop might have been produced on that soil. One of appellants' witnesses testified that the fields were quite weedy when he saw them after the dusting had been done, the foul growth consisting of morning glory, wild radish and mustard, all of which were plants tending to deplete the moisture available for the cultivated crops. This same witness said that lack of moisture would cause the plants to turn yellow, that thrips and red spider would likewise contribute to this condition, along with

poor soil conditions and that there were plants whereon the infestations were sufficient to kill the plant completely. Respondent's witnesses testified that as early as about three weeks before the dusting the leaves appeared to be damaged by thrips and the lower leaves were wilting and drooping. Mr. Storm, who had watched the crops closely, ascribed the primary cause of the crop failure to injury by thrips, with later on a build-up of red spiders; he said thrips had a lot to do with the damage to start with, the red spiders contributing in the latter stages, and while he did not examine the soil for moisture he said the plants looked dry and desiccated. He testified the dosage used was not excessive.

Paul Mazzetti, who was a chemistry graduate from the University of Turin in Italy and had had wide experience in California in the sale and use of insecticides, testified for respondent that from his examination of the bean plants in appellants' fields the crop failure was due to infestation by thrips and lack of moisture. Another witness for respondent made a casual inspection of the soil and declared he found it hard, and as to the vines found that the lower half was affected by thrips. Still another entomologist called by respondent found that just after the dusting the basal leaves had dropped off the plants and other leaves were quite dry and withered, which effect he said revealed severe injury by thrips, combined with lack of moisture. He said loss of the leaves would reduce the ability of the plant to convert raw foods into organic foods and reduce the availability of food for further development of the plant itself.

As we said before, there was much testimony introduced by appellants supporting their cause. Outstanding in their testimony was proof that a one-half acre plot of beans dry farmed on land comparable to at least part of the land on which the field crops were planted produced at the rate of 12 sacks per acre under conditions similar in most material respects to the conditions affecting the field crops, save only that the half-acre plot had not been dusted with respondent's insecticides. This plot, too, had been infested by thrips, but the infestation had not prevented a fair crop. A test was made on this small plot by dusting small parts with each of the two insecticides and damage followed. Appellants rely strongly on this demonstrative evidence and upon the opinion of their expert witnesses that they must conclude therefrom that the failure of the field crops to produce was because of

the damaging effect of the insecticides. Of this evidence it must in fairness be said that it was most persuasive, but it cannot be said that it was conclusive on the issue of crop failure.

The trial court, after hearing testimony that fills 500 pages of the reporter's transcript, found that the insecticides used were not harmful to the crops and did not damage them; that on the contrary the crop failure was due to lack of moisture and the heavy infestation of thrips; that prior to the application of the insecticides the crops had been substantially damaged by thrips and red spider and that the application of the insecticides had been made too late to control the pests; that the insecticides used were reasonably fit for the purpose intended and that the application was in reasonable amounts and pursuant to standards generally recognized by bean growers; that respondent did not represent that he personally was skilled in the use of dusts and sprays, but on the contrary told appellants that he would use a dust recommended by manufacturers; that he did not tell them the dust would prevent pests from destroying the crops, but said that he would apply a recommended insecticide and made no other representations; that the insecticides were not negligently applied nor was the mixture too strong or applied in excessive quantities, but that the application was in the ordinary and customary manner and that respondent used due care in both application and selection of insecticides, proper for the control of thrips and was not responsible for loss or damage to the crops, which damage, as hereinbefore stated, the court expressly attributed in its findings to the lack of moisture in the soil and the prior heavy infestations of thrips with the contributing effect of the red spider attack.

We think it apparent that in this case the trial court was confronted with a question of fact difficult of solution. Appellants' cause depended upon proof that the insecticides were harmful and were negligently used and that either or both of these factors caused the damage. On the other hand, respondent attributed the crop failure to insects and drought and poor soil. That there was a crop failure was admitted. Clearly, the insects and the lack of moisture could have caused the failure. It may be conceded also that chemical insecticides, if wrongly selected and carelessly used, could do the same. Under the evidence the court could have found either for or against the conflicting theories. It found upon substantial evidence that pests and drought caused the failure.

Negativing appellants' allegations, the court also found that the insecticides were properly selected and used. For this, too, there was evidentiary support. As to one, many witnesses testified it was well known and widely used. As to the other, not so much was known—but both were shown to be very similar and though both were used on separate areas the failure was uniform over all, so that the court was justified in concluding that both had the same effect and for the purpose of resolving this case should not be differentiated. In any event, the court's finding the failure was caused by insects and drought necessarily negatived the existence of other causes and completely disposed of the litigated issues.

The judgment is affirmed.

Adams, P. J., and Peek, J., concurred.